BEFORE THE FIRST DIVISION, AUGUST 2, 1956

**No. 60140.**—Empire Findings Co., Inc. *v.* United States, protest 233818–K (New York).

OLIVER, Chief Judge:   This protest is limited to the merchandise variously described on the invoices as blue beads and assessed with duty at the rate of 22½ per centum ad valorem under the provision in paragraph 1503 of the Tariff Act of 1930, as modified by T. D. 51802, supplemented by T. D. 51898, for "Beads in imitation of precious or semiprecious stones, of all kinds and shapes, of whatever material composed, not otherwise provided for in paragraph 1503, Tariff Act of 1930."   At the time of trial, Government counsel conceded that the specific classification by the collector was imitation turquoise beads.   Plaintiff claims that the beads in question are "not in imitation of any precious or semiprecious stones," and, therefore, are properly classifiable under the residuary provision for beads, not specially provided for, in paragraph 1503, as modified, *supra*, carrying a dutiable rate of 17½ per centum ad valorem.

Samples of the articles in question were received in evidence (plaintiff's collective exhibit 1).   They are tiny round beads, pale blue in color, and perforated through the center.

The president of the importing corporation (plaintiff herein), a dealer in "surgical and hospital supplies," testified that these "baby blue beads" are used in hospitals, in connection with a system to identify "new-born babies."   The beads are made into necklaces "and strung on the same string of cord are the initials which spell out the surname of the mother."   A necklace is placed around the neck of the infant at birth and is kept there as a positive means of identification, until mother and child leave the hospital.   The witness further stated that he had manufactured in this country similar articles of the same color as the beads in question, but his testimony contains nothing concerning the manufacturing processes employed.   He also stated that, when his "inventory of stock would be out," he tried to purchase beads of this shade, called "baby blue," but none of the importers in New York had that shade.

Plaintiff's second witness was an expert on mineralogy, a subject he has been teaching since 1944.   At present, he is a professor of mineralogy at Columbia University, and he is also curator of minerals at the American Museum of Natural History.   During the course of his experience, he has been called upon "as an advisor to jewelers and to people handling precious stones."   The witness stated that he has examined specimens of turquoise "ever since the middle 30's," that he is familiar with the stone, and that he has "often been consulted with regard to it."   Asked to state the characteristics of turquoise, the witness replied as follows:

The characteristics of turquoise stone are its color, which is a blue, or a greenish blue, and its opacity; that is to say it is not a transparent stone like many of your gem stones are. There are other properties; its hardness and its density, which enable one to identify it quite definitely.

He stated further that turquoise, in the raw state, has "a waxy lustre" and that genuine turquoise is never used as beads. Referring to its use, the witness testified as follows:

Turquoise is generally used in the form of what is known in the jewelry trade as a cabochon cut. It is generally cut in hemispherical forms, one curved surface and one flat surface, and these are mounted in bracelets or brooches or rings.

Following an examination of the merchandise in question (collective exhibit 1, *supra*), the witness testified that he had never seen turquoise of the color of these beads, which are "much paler in color than true turquoise." The beads under consideration are too light to be turquoise. "In texture there is no significant difference" between genuine turquoise and the merchandise in question.

The witness produced 20 pieces of turquoise, varying in size and shape, taken from the collection of the American Museum of Natural History. The witness described them as "mostly hemispherical" in shape. None was the shape of a plain round bead, and none was perforated. They were darker than the merchandise in question and had a greenish tinge that is not visible in the beads involved herein. The witness testified further that genuine turquoise is variable in color, ranging from "the pure blue to the greenish blue," and that low quality turquoise might have a grayish tinge, but it is such a low grade and is so poor that it is not regarded as suitable for turquoise.

On cross-examination, the witness testified that the green in genuine turquoise is part of the normal variability in color of the stone. Asked by the court whether he had ever seen a necklace made of genuine turquoise beads, or globular pieces of turquoise, the witness stated that he had seen only one necklace "made of rough pieces of turquoise, which was used by the Indians in the west." It consisted of "50 or 60" stones that varied in color, but none was as light in color as the beads in question. The witness was unable to state with certainty "by visual inspection without making any sort of test at all" whether a collection of four beads (defendant's illustrative exhibit A), shown to him by Government counsel, is genuine turquoise.

Two witnesses testified on behalf of defendant. An importer with 37 years' experience in the importation of imitation stones and semiprecious stones, including imitation and genuine turquoise, testified that the beads in question are imitation turquoise in opacity and in color. He stated that he had seen genuine turquoise as light as, or lighter in color than, the beads in question. Such a stone was characterized as "poor quality turquoise, and very light shade." Contradicting plaintiff's testimony, the witness stated that he had seen necklaces made of genuine turquoise beads, round in shape and pierced for stringing. In such necklaces, there was always a variation in the color of the stones. The witness identified the genuine turquoise stones (defendant's illustrative exhibit A, *supra*) as merchandise taken from his stock. In stating that the beads in question are similar to genuine turquoise, the witness had reference to color only. Questioned concerning the texture of the stones, the witness testified that "In our industry, we don't use the word 'texture.' We use shade of each color." He stated further that imitation stones are glass articles, the various shades coming from the type of glass that is available. Referring to his importations of genuine turquoise from Germany, he stated that he ordered the merchandise according to color, i. e., "Persian green," "Persian shade," or "light shade turquoise, poor quality," that the imported stones are predominantly greenish blue, that very light-blue stones are the exception, and that every stone is polished, some better than others, depending on the quality of the stone.

Defendant's second witness was the assistant appraiser of merchandise at the port of New York who, since 1940, has examined, for customs purposes, "stones, precious stones, imitation precious stones, and semiprecious stones," including turquoise, both the genuine stone and imitations thereof. In connection with his official duties, he completed a course in gemology at Columbia University and visited many museums. The witness testified that the beads in question imitate turquoise and that they are similar to genuine turquoise in color and opacity. He stated further that genuine turquoise varies in color from a predominantly greenish-blue hue to "sky blue," like the beads in question, and that he has seen genuine turquoise in the form of beads of all shapes.

It should be noted that the provision in paragraph 1503, as modified, *supra*, under which the present merchandise was assessed, includes beads *of all kinds and shapes* and *of whatever material composed*, so that if the beads in question are in imitation of turquoise, they are properly classifiable under the provision invoked by the collector, without regard to their shape or the material of which composed, so long as their identity as beads is not destroyed. *United States* v. *G. Klein & Son*, 42 C. C. P. A. (Customs) 73, C. A. D. 574. That the articles under consideration are beads, cannot be disputed. Furthermore, the use of these beads after importation is of little importance in determining their tariff classification. *Leonard Levin Co.* v. *United States*, 27 C. C. P. A. (Customs) 101, C. A. D. 69.

"There is a presumption of correctness which attaches to the Customs Collector's classification. In order to overcome this presumption, the importer has the burden of proving that the Customs Collector was wrong in his classification and that he (the importer) is correct," the *G. Klein & Son* case, *supra*. On the basis of the record herein—the oral testimony as well as the exhibits—plaintiff has not sustained its burden of proof. While some of the testimony before us is conflicting, there is general agreement among the witnesses for both sides with respect to the similarity in certain characteristics of the beads in question and genuine turquoise. All the witnesses are in agreement concerning the similarity in opacity between genuine turquoise and the merchandise under consideration. To some degree, the beads in question are lustrous, which is a characteristic of genuine turquoise. Plaintiff's testimony includes the admission that there is "no significant difference" in the texture of these beads and genuine turquoise. Also, there is testimony showing that genuine turquoise varies in color from a greenish blue to a very light blue, identified herein as "baby blue," like the beads in question, and that genuine turquoise is made into beads of all shapes and strung in the form of necklaces.

On the basis of the present record, we find that the preponderance in weight of the evidence supports the collector's classification. Accordingly, we hold the merchandise in question, variously described on the invoices as blue beads, to be properly classifiable under the provision for "Beads in imitation of precious or semiprecious stones, of all kinds and shapes, of whatever material composed," in paragraph 1503, as modified, *supra*, and dutiable thereunder at the rate of 22½ per centum ad valorem, as assessed by the collector.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.